UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

CHARLENE A. ROYCE, as parent and guardian
of TIFFANY M. WHEELER, and
TIFFANY M. WHEELER,

                       Plaintiffs,

             - against -                            AFFIDAVIT

THOMAS R. WHEELER, LISA W. HUZELLA,
and MICHAELON A. WRIGHT, each individually
and as acting successor trustee of the              Civ. No. 07-CV-10968 (RWS)(FM)
Thomas M. Wheeler Revocable Trust, u/a dated
April 9, 1986, as Amended and Restated, and
43 WEST 64TH STREET LLC, a Michigan
corporation, KRYSTAL M. WHEELER,
and the WHEELER FAMILY FOUNDATION,
INC., a Delaware non-profit corporation,

                       Defendants.

---------------------------------------------------------------X

STATE OF NEW YORK  )
                               ) ss.:
COUNTY OF NEW YORK  )

      CHARLENE A. ROYCE, being duly sworn, deposes and says:

      1.      I am the mother of Krystal M. Wheeler ("Krystal") and Tiffany M. Wheeler ("Tiffany"), the youngest daughters of Thomas M. Wheeler ("Tom"). I am also plaintiff in this action, which I commenced in December 2007 in my capacity as mother and legal guardian of Tiffany, who became of age this month and has accordingly joined as plaintiff.

      2.      I make this affidavit in opposition to defendants' motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure and, in particular, to bring to the Court's attention certain facts relevant to the jurisdictional issues raised by that motion.

3. Tom was the father of my two daughters and only children, Krystal and Tiffany.

4. I moved to New York City with my daughters in 2003 and have lived since then in a condominium apartment, at 43 West 64th Street, that Tom purchased for us. Throughout that time I have paid the maintenance expenses for the apartment.

5. Although I was separated from Tom a number of years ago, we continued to maintain a friendly and close relationship. He often visited me and the girls in New York; we often visited him, at homes he maintained in Florida and elsewhere and on his yacht; and we made a number of extensive trips together, to Europe and elsewhere.

6. Until the last months of his final illness, I spoke with Tom frequently on the telephone in addition to our visits in person.

7. By virtue of my having known Tom since 1985, lived with him for many years and having continued a warm and positive relationship with him thereafter and by virtue or our continuing common bond of affection and care for our daughters, Krystal and Tiffany, I became familiar with many details of his business and personal affairs. In particular, I came to know very well not just the members of his family -- including his three children, now in their 50's, by his first marriage (Defendants Thomas R. Wheeler ("Tommy"), Lisa W. Huzella ("Lisa") and Michaelon A. Wright ("Michaelon") (collectively, the "Trustee Defendants")) -- but also his primary business associates and those who managed his affairs.

8. Among those were Douglas Soifer, Tom's longtime tax attorney, and Paul Oster, a CPA who had responsibility for many years for accounting and tax issues for Tom and his personal and business interests. Both Soifer and Oster have, to my knowledge, always lived in Michigan.

9. The suggestion that Tom is a "Texas businessman" is misleading at best. He was born and raised in Michigan, and his funeral and burial were in his home town of Kalamazoo. He maintained homes in Michigan for most if not all of his life, and his draft estate tax return (attached as Ex. 11 to the March 14, 2008 Affidavit of Defendants' Texas counsel, Amy Stewart Sanders ("Sanders Aff."), p. 8) shows that he owned personal property at a residential address in Birmingham, Michigan. He spent his entire business career running businesses out of offices in Michigan (in Rochester Hills and other suburbs of Detroit), and the draft estate tax return again shows substantial anticipated income tax returns from the State of Michigan (Sanders Aff. Ex. 11, p. 8).

10. For the more than 20 years that I knew Tom, all of his many leading advisors, legal, accounting and business, were in Michigan.

11. Tom maintained memberships in private clubs in the Detroit area, attended games of Detroit-based sports teams and had many social connections there that were important to him.

12. Like many very wealthy people, Tom was able to maintain homes in a number of different places. When he and I lived together, we spent much of the time in Florida, on his boat and in Aspen, Colorado, where he bought more than one substantial property, including one known as Watson Divide, more than 700 acres that his son Tommy has, upon information and belief, developed with a house of more than 15,000 square feet.

13. Any suggestion that El Paso, Texas was Tom's primary residence at the time of his death is mistaken. He often told me that he did not like being there. Although he used to own a house in El Paso, he sold it several years ago. As confirmed in the inventory of assets in his estate, filed on February 11, 2008 (Sanders Aff. Ex. 11), he did not own any real property in El Paso or in Texas at the time of his death.

14. Tom's companion of several years, Lizeth Modesto, maintains a home in El Paso, which I believe he bought for her. I am aware, however, that he never spent much time there at all, particularly in the last year of his life. It would be fiction to characterize him as living there there.

15. As noted in the Amended Complaint and acknowledged in defendants' motion, Tom founded and developed a very successful automotive parts company called Electro-Wire, most of the assets of which were sold in 1995 to Alcoa. (*See* Amended Complaint ¶ 43, Affidavit of Donald R. Brooks, sworn to March 14, 2008 ("Brooks Aff.") ¶ 4.) Although Electro-Wire maintained some manufacturing operations in El Paso (as well as in Mexico, Canada and other parts of the U.S.), those assets were sold in 1995, and the successor to Electro-Wire, TMW Enterprises ("TMW") did not thereafter maintain any manufacturing operations, in El Paso or anywhere.

16. Mr. Brooks knows this full well. For many years, I understand his firm was the primary sales agent for Electro-Wire. Not only does his affidavit acknowledge that "principally all of the operating assets" of Electro-Wire (including any plants in El Paso) were sold in 1995 -- some 13 years ago -- but his attempt to characterize El Paso as "principal manufacturing headquarters" of Electro-Wire even then is misleading.

17. The corporate headquarters of Electro-Wire were always in Michigan, just as those of TMW have been there since the sale of substantially all of Electo-Wire's assets in 1995. Mr. Brooks is well aware that the corporate headquarters of TMW are in Rochester Hills, Michigan (Amended Complaint ¶ 46) and that it has no operations or, upon information and belief, offices or personnel in El Paso.

18. The repeated assertion in defendants' motion papers that Tom resided in El Paso and suggestion that his estate has any significant Texas-based assets are at odds with the facts.

19. As more fully set forth in the accompanying affirmation of my attorney in this matter, Charles G. Berry of the firm of Arnold & Porter LLP, dated April 23, 2008 ("Berry Aff.") and the accompanying memorandum of law, the probate proceeding commenced in El Paso Probate Court by Tommy, Lisa and Michaelon, all defendants herein, is a sham.

20. Not only was that proceeding brought without constitutionally adequate notice to Krystal, Tiffany and me, but it is based on a bogus assertion of subject matter jurisdiction, which is presently being challenged. (*See* the "Special Appearance" filed on behalf of myself and the girls, dated March 17, 2008 (Ex. B to the accompanying affirmation of Charles G. Berry, dated April 23, 2008 ("Berry Aff."), seeking dismissal of the Texas Trust application filed by Defendants (Sanders Aff. ¶ 23 and Ex. 13).

21. The duplicitous manner in which those proceedings were filed and pursued merely underscores the desperation of Tommy, Lisa and Michaelon and the other defendants (and their counsel) to avoid the scrutiny that is among the relief sought in this action.

22. Neither Krystal, Tiffany nor I received personal notice of the filing of Tom's purported will with the Texas Probate Court on May 29, 2007 or its admission to probate there in June 2007.

23. Over the course of many months, from shortly after Tom's death on February 9, 2007 through October 2007, I had conversations with Michaelon, and a New York lawyer named Derek Sells had conversations on my behalf with a lawyer at the Detroit, Michigan law firm of Honigman et al., Patrick Duerr, with respect to the Trustee Defendants' demand that the girls and I vacate the apartment that Tom bought for us and on which I have been paying maintenance and

other expenses for several years. Mr. Sells (who is submitting a separate affidavit herewith) was retained to represent the interests of the girls and me concerning Tom's property and the apartment in particular.

24. Not once during the numerous conversations that I had with Michaelon of those that Mr. Sells had with Duerr, did they mention that Tom's will had been offered for or admitted to probate, in El Paso or anywhere else. They never mentioned that there were any proceedings there of any kind, and the girls and I had no conceivable reason to think that there would be any.

25. The extent of Duerr's lack of candor over the course of at least a full year is astonishing.

26. While he was secretly engineering the probate of a purported will in El Paso, he refused even to furnish a copy of that will except pursuant to a "Non-Disclosure Agreement."

27. Attached as Exhibit 1(a) to the Affidavit of Patryk J. Chudy, sworn to March 14, 2008 ("Chudy Aff.") is an agreement dated June 5, 2007 (the "June 5, 2007 NDA"), which Duerr insisted be signed by me, Krystal, Tiffany and our lawyer, Derek Sells. It bears the footer "DETROIT" in the lower left, evidently indicating that it was drafted at the Detroit office of the Honigman firm.[1]

28. The June 5, 2007 NDA -- which is not signed by Duerr or any representative of the Estate of Thomas Wheeler -- recites that the Estate is "willing to provide" me and the girls

---

[1] The Chudy Affidavit and exhibits, consisting of the NDAs and the various trust agreements and amendments, were filed with a request that they be under seal. We object to such unusual and unnecessary treatment. Many of the relevant provisions of the trust agreements are already quoted or paraphrased in Defendants' motion papers and the Amended Complaint, and there is no important privacy interest in keeping the entirety of those instruments confidential. Nor is there any conceivable reason to file the NDAs under seal, except Defendants' understandable desire to draw the cloak of secrecy over their reprehensible pattern of non-disclosure.

with copies of "the Thomas M. Wheeler Trust u/t/a dated 4/9/86, as amended (the "Trust Agreement")," on the condition that we keep it confidential.

29. In fact, Duerr did not furnish the entire Trust Agreement at that time, but only limited portions of it.

30. As explained in the Amended Complaint, a full understanding of the Trust requires review of <u>all</u> the amendments (copies of which are annexed to the Chudy Affidavit). In particular, the 2002 Amendment and Restatement (Chudy Aff. Ex. 4) reveals Tom's intention to treat Krystal and Tiffany equally with their half-siblings (Amended Complaint ¶¶ 3, 51-52) and casts in doubt the validity of the deathbed amendments of January 6, 2007 and January 22, 2007 (Chudy Aff. Exs. 3 and 2, respectively), purportedly executed by him when he was in the final stages of terminal renal cancer.

31. After extracting from us the June 5, 2007 NDA, however, Duerr did not furnish the 2002 Amendment and Restatement. He only produced portions of the amendments under which Krystal and Tiffany would receive substantially less from the Trust (Amended Complaint ¶¶ 69, 73, 77). Nor did he initially furnish a copy of Tom's will.

32. Because the document that Duerr did furnish in June 2007 made reference to the prior amendments, I asked through our lawyer that we be given copies of those earlier amendments (including the 2002 Amendment and Restatement).

33. Duerr refused to do so for several months, however, insisting instead, under threat of eviction proceedings, that the girls and I vacate immediately the apartment that Tom had bought for us.

34. It was not until September 2007 that Duerr indicated that he would furnish the complete set of trust amendments and restatements that we had requested, as well as a copy of Tom's will. Again he insisted that a Non-Disclosure Agreement be signed.

35. Attached as Exhibit 1(b) to the Chudy Affidavit is a copy of an agreement dated September 14, 2007 (the "September 14, 2007 NDA"), signed by our lawyer Derek Sells but not by us -- or by Duerr or any representative of Tom's estate. This agreement indicated that the Estate was "willing to provide" us with "the Thomas M. Wheeler Trust u/t/a dated 4/9/86, 12/14/95 and 5/11/02, and the Will dated January 6, 2007, with all amendments and restatements."

36. Even after Mr. Sells signed and delivered this to Duerr, the promised documents were not forthcoming. It was not until the last week of October 2007 that we finally received the earlier trust amendments, including the 2002 Amendment and Restatement, which showed how drastically the provisions for Krystal and Tiffany had been altered between then and the final, now clearly suspect iterations of the Trust. It was the disclosure of that document that particularly prompted us to pursue the relief sought in this action.

37. What we have now learned -- which makes Duerr's conduct (and those of his clients) all the more shocking -- is that while he was declining to share with us these documents that he knew were of interest and importance to us and would likely cause us to be concerned about the girls' rights vis-à-vis their half-siblings, Duerr was orchestrating a secret probate process in El Paso.

38. A week before requiring us to sign the June 5, 2007 NDA in order to obtain information that in fact he did not share until almost five months later, Duerr had arranged for the filing in the El Paso Probate Court, on May 29, 2007, of a will dated January 6, 2007.

39. Neither I nor Krystal nor Tiffany received any personal notice or service by mail of the filing of this will or the commencement of the probate proceeding in Texas.

40. In fact, the only notice that was given was by publication, by posting "at the courthouse door" of the El Paso Probate Court and subsequent publication in a weekly periodical of limited circulation called "El Paso, Inc."

41. Not surprisingly, this notice by publication -- of dubious Constitutional adequacy -- did not reach us. For eight months we had no idea that there were any probate proceedings in Texas, a jurisdiction that we would not have thought to check even if we had suspected that there were probate proceedings pending somewhere. (Duerr's conduct, indeed, led us to believe that, as many wealthy individuals choose to do, Tom had arranged for his wealth to pass without probate through an *inter vivos* trust.)

42. The temerity of Duerr's duplicity is underscored by the fact that he would not even furnish us with a copy of the will that had been secretly offered for probate in Texas without requiring our lawyer to sign the September 14, 2007 NDA. That document includes "the Will dated January 6, 2007" within the definition of "Confidential Information" (Chudy Aff. Ex. 1(b)).

43. By the time Duerr insisted on the second NDA, however, the will had already been admitted to probate and, in fact, had been available since May 29, 2007 in the public file of the El Paso Probate Court. By insisting on confidential treatment of a document that he knew was publicly available, Duerr further misled us -- obviously in an effort to preclude any challenge to the documents that he and his firm had prepared and were championing.

44. Not only is it highly disturbing to me that a lawyer would resort to such under-handed tactics, but it is also clear that his lack of candor is equally attributable to his clients -- the

Tommy, Lisa and Michaelon -- who, as purported trustees, owed and still owe a duty of loyalty and honesty to Krystal and Tiffany. In an effort to prevent inquiry into the highly suspicious events surrounding the deathbed documents that diminished so significantly the interests of their half-siblings, Tommy, Lisa and Michaelon (and Duerr and their other representatives) compounded their wrongdoing by breaching their fiduciary duties of candor and disclosure.

45. The continuing duplicity of Duerr and his clients is detailed in the accompanying affirmation of our lawyer, Charles Berry. He explains that it was not until January 29, 2008 -- eight months after Duerr and his local counsel in Texas filed the purported will there -- that we were finally informed (not by Duerr but by defendants' New York litigation counsel, Richard Martin) that there were, in fact, probate proceedings pending (with respect to the estate, not the Trust).

46. But it gets worse.

47. Not satisfied with orchestrating a secret probate proceeding and keeping me and my daughters -- Tom's beloved youngest children -- in the dark about his property and their rights, Duerr and his clients tried to engineer an *ex post facto* designation of Texas as Tom's residence and situs of the Trust.

48. We did not learn of these further machinations until March 15, 2008, when defendants served their motion herein to dismiss for claimed lack of subject matter jurisdiction.

49. Buried in those papers was a virtually illegible copy of Tom's death certificate (Sanders Aff. Ex. 7, p. 6). Described as a New York State "Estate Tax Approval of Extension to File," it was attached to the underlying application (p. 2 thereof, signed by Duerr on November 6, 2007), and accompanying "New York State Estate Tax Domicile Affidavit" (Form ET-141) signed by Tom's longtime tax attorney, Douglas S. Soifer (*see* ¶ 8, *above*) on November 7, 2007.

50. Although most of this copy of the death certificate included with the New York State tax form was illegible, my counsel and I were struck by a barely legible notation in the upper left indicating that the death certificate had been "amended" -- on "June 24, 2007." It seemed highly peculiar that a death certificate would be amended, particularly so long after the date of death. It was also curious that this amendment was dated just one day before the will was admitted to probate in Texas, June 25, 2007 (*see* Sanders Aff. ¶ 19 and Ex. 9).

51. So we arranged to obtain a legible copy of the death certificate. A copy is attached as Exhibit A.

52. What we found was remarkable.

53. The original death certificate (essentially the left-hand side of the copy attached hereto as Ex. A) showed that it was signed by the "certifier" on February 22, 2007 (Item 31b), signed by the "subregistrar" on February 27, 2007 (Item 37), and filed by the "registrar" on March 13, 2007 (Item 38b).

54. The "informant" (the person furnishing the information about the decedent) was shown as being "Margaret Bargardi" (Item 22a), whose "relationship to decedent" was indicated as "executor" (Item 22b), with a "mailing state" of Michigan (Item 23a). Margaret is, in fact, Tom's longtime assistant, who I have known for over 15 years. She paid his bills, wrote checks on his checking accounts, and handled many of his personal arrangements, including travel, medical and much more. Certainly she was, and is, someone knowledgeable about where Tom lived and spent his time. In fact, she helped coordinate all of his comings and goings and undoubtedly kept a calendar for his appointments and travel.

55. Significantly, the information -- evidently furnished by Margaret shortly after Tom's death on February 9, 2007 -- showed that he was a resident of <u>Florida</u>. That is indicated

in the box for "residence - state" (Item 14a). In fact, a specific address is shown: 530 North Ocean Drive, Apt. 1003, Juno Beach, Palm Beach County.

57. Apparently, however, Duerr and his colleagues rethought the desirability of having Tom as a resident of Florida and more than four months later arranged for Margaret to swear to an amendment to this information, changing his designated state of residence from Florida to Texas and listing an address in El Paso (6616 Wind Ridge) where his companion of recent years -- Lizeth Modesto -- apparently still lives (*see* Sanders Aff. Ex. 13, p. 3 (Declaratory Judgment Petition filed in El Paso Probate Court on February 19, 2008). Margaret's signature on the amendment is shown as having been notarized on June 19, 2007; it appears that Duerr et al. had to get the funeral director to sign, as notarized on June 20, 2007; and the filing date is shown as June 24, 2007 -- just one day before the El Paso Probate Court issued its probate decree.

57. This highly unusual effort to manufacture a new state of residence for a decedent five months after his death is disturbing to say the least.

58. Having been in close touch with Tom for the last several years of his life (except for the months when he was confined to Tommy's vacation house in Fountain Hills, Arizona, where the girls and I were largely prevented from speaking with or visiting Tom), I can say categorically that Tom did not spend more than a handful of weeks in El Paso during those years. Several years before he died he had sold or given away the house he once owned there. Except for occasional visits he may have made to his companion Lizeth, he spent very little time there. As noted, moreover, the inventory of assets in his estate (Sanders Ex. 11) shows no real property there and not even any personal property that would necessarily be located there.

59. I also learned for the first time in the motion papers filed by the defendants on March 15, 2008 that Tommy, Lisa and Michaelon, as purported trustees of the Trust, tried to

indulge in another exercise in *ex post facto* fiction, by executing a document styled as "Notice of Change of Situs," a copy of which is attached to the Sanders Affidavit as Ex. 6. Signed and notarized by Tommy and Michaelon in Michigan and Lisa in Colorado, all on May 24, 2007, this document purports to transfer the "situs and place of administration" of each of the Trusts under the Trust Agreement to Texas. (Sanders Aff. Ex. 6) (Contrary to her statement that this change of situs was effected "[o]n February 9, 2007" (id. ¶ 16), the document was executed on May 24, 2007 and attempts to make the designation "effective" retroactively to the date of death.)

60.     The reasons why Duerr and his clients engaged in these highly unusual and suspect acts to try to engineer a Texas residence for Tom and situs for administration of the Trust are evident: they hoped to diminish the rights of Krystal and Tiffany and even their ability to be informed of their rights.

61.     As noted, Duerr and his clients managed to keep us from even knowing about the Texas probate process for fully eight months.

62.     I am informed that there is also another important reason why they tried to manufacture Texas jurisdiction: the law of Florida states unequivocally that *in terrorem* clauses such as are contained in the January 2007 amendments to the Trust here are <u>unenforceable</u>.[2]

---

[2] *See* Florida Satutes

732.517 Penalty clause for contest.--A provision in a will purporting to penalize any interested person for contesting the will or instituting other proceedings relating to the estate is <u>unenforceable</u>.

736.1108 Penalty clause for contest.--

(1) A provision in a trust instrument purporting to penalize any interested person for contesting the trust instrument or instituting other proceedings relating to a trust estate or trust assets is <u>unenforceable</u>.

(2) This section applies to trusts created on or after October 1, 1993. For purposes of this subsection, a revocable trust shall be treated as created when the right of revocation terminates.

63. Although even the January 2007 Amendments are clearly governed by Florida law, Defendants have sought after the fact to select the law of administration of a different state in a belated effort to avoid the clear rule in Florida that contests to trusts may be brought without triggering an *in terrorem* clause.

64. I note finally that the affidavits of Donald Brooks and Robert Howard present no facts that can establish that Tom had a valid domicile in El Paso. Their account of events long past (Electro-Wire's operations prior to sale of most of its assets in 1995) has no relevance to the present inquiry. And the statements concerning Tom upon his arrival in Florida days before he died are aimed at creating a misimpression of the dire, terminal and helpless condition he was in at the time.

65. I finally note Tom's repeated expressions of affection for our daughters, Krystal and Tiffany, and in particular the conversations we had with him during his last visit with us, in June 2006, which are described in their accompanying affidavits.

For the reasons set forth herein and in the accompanying papers, I respectfully request that the motion to dismiss be denied or, in the alternative, that discovery be permitted on the jurisdictional issues.

_____
Charlene A. Royce

Sworn to before me on
April 23, 2008

_____
Notary Public

LOUIS H. CHAMPAGNE
Notary Public, State of New York
No. 01CH6066853 Qualified in Queens County
Certificate Filed in New York County
Commission Expires November 26, 2009