UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHARLENE A. ROYCE, as parent and guardian
of TIFFANY M. WHEELER, and
TIFFANY M. WHEELER,

     Plaintiffs,

  - against -            **AFFIDAVIT**

THOMAS R. WHEELER, LISA W. HUZELLA,
and MICHAELON A. WRIGHT, each individually
and as acting successor trustee of the    Civ. No. 07-CV-10968 (RWS)(FM)
Thomas M. Wheeler Revocable Trust, u/a dated
April 9, 1986, as Amended and Restated, and
43 WEST 64TH STREET LLC, a Michigan
corporation, KRYSTAL M. WHEELER,
and the WHEELER FAMILY FOUNDATION,
INC., a Delaware non-profit corporation,

     Defendants.

---

STATE OF NEW YORK  )
         ) ss.:
COUNTY OF NEW YORK )

  KRYSTAL M. WHEELER, being duly sworn, deposes and says:

  1.  I am one of the two younger daughters of Thomas M. Wheeler. My mother is Charlene Royce, and my sister is Tiffany M. Wheeler.

  2.  I make this affidavit in opposition to the motion by defendants, including my half-siblings Thomas R. Wheeler, Lisa W. Huzzella and Michaelon A. Wright, to dismiss this action.

  3.  I have read the accompanying affidavit of my mother, Charlene Royce, and confirm that, as she has set forth in much greater detail, I was never aware of any probate proceedings in El Paso, Texas until after January 29, 2008, when Charles Berry, attorney for

plaintiffs herein, was advised of that fact by the New York litigation attorney for the defendants in this action.

4.  In addition to the statements about the role of defendants' attorney Patrick Duerr, I wanted to bring to the Court's attention information about the one and only time I met him. It was shortly after my father's death, on the occasion of his funeral service in his home town of Kalamazoo, Michigan.

5.  As my mother has explained, initially she was told that she and Tiffany and I were not welcome at my own father's funeral. We nevertheless found out where it was going to be any traveled there for the occasion.

6.  We were staying at a hotel which, we later learned, was just a short drive from the church where the funeral mass was. As we were in the lobby of the hotel, getting ready to go to the church, we were met by a man who I learned was Mr. Duerr. He offered to show us how to get to the funeral and suggested we follow his car. Since we were unfamiliar with Kalamazoo, we accepted his suggestion.

7.  Instead of a short ride to the church, however, Mr. Duerr took us on a long, circuitous and time-consuming trip. After a while we realized that he was not taking us to the church on a direct route but in fact had been heading out of town. Finally we arrived at the church just as the service was beginning. My half-brother Tommy and his sisters, Lisa and Michaelon, were standing by the casket, and he indicated that we were not welcome to sit with them but should go to the pews at the rear of the church.

8.  It was evident to me from the wild goose chase that Mr. Duerr took us on that he was trying to prevent us from being present at all at our own father's funeral.

9. After the service, some of my father's former colleagues who had known us growing up, including employees of his company TMW Enterprises, came up to me and Tiffany and told us how sorry they were to see the treatment we had received and how upset they knew our father would have been if he had known of it.

10. I have not seen or spoken to Mr. Duerr since that day, but what I have learned about his later conduct relating to this case is consistent with this disturbing incident in connection with my father's funeral.

11. Although I am not a plaintiff in this proceeding, I have read the Amended Complaint, believe the allegations therein that are within my knowledge to be true, and have no objection to the relief sought by my mother on behalf of my sister Tiffany (and now by Tiffany herself, since she has reached the age of 18 and is appearing as plaintiff).

12. The Amended Complaint furnishes considerable detail about the warm and loving relationship that I enjoyed with my father. I confirm that he consistently expressed his affection for me and my sister (and my mother) and a desire to see that Tiffany and I were well taken care of after his death.

13. In particular, I recall my father's visit with us at our apartment in New York City in June 2006 and a number of conversations we had then, which was the last time I saw him prior to seeing him at the ICU in West Palm Beach shortly before day he died on February 9, 2008.

14. Although on his numerous prior visits with us in New York he had stayed at hotels, on this occasion he wanted to stay with us at the apartment, and we were pleased to have him do so.

15. He spoke to us about his kidney cancer, which had been diagnosed some time before, and told us about his having had a kidney removed earlier in 2007. He said he was going

to "beat" it, but I understood how serious his condition was, and he was visibly weaker than he had been on prior visits.

16. During that stay in June 2006 my father told me and Tiffany many times how much he loved us. Although he had said this to us on many prior occasions, he was more emphatic and insistent in expressing his affection during that visit.

17. He also told us that he had made provision for Tiffany and me after his death equal to provisions he had made for our half-siblings. He said he wanted to be sure that when he was gone the provisions he had made for us would not be changed from the equal treatment he intended for us. He also urged us strongly that if for any reason those provisions turned out to have been changed, we should fight to see that his true intentions were carried out.

                     _____
                       Krystal M. Wheeler

Sworn to before me
on April 23, 2008

_____
Notary Public

LOUIS H. CHAMPAGNE
Notary Public, State of New York
No. 01CH6066853 Qualified in Queens County
Certificate Filed in New York County
Commission Expires November 26, 2009

- 4 -